# The Dickerson Law Group

**Brian E. Dickerson**
Partner
6846 Trail Blvd
Naples, FL 34108
Direct: 202.570.0248

Bdickerson@dickerson-law.com

November 18, 2021

**VIA EMAIL**
*Original will not follow by mail.*

The Honorable Analisa Torres
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

> Re:   *In re Search Warrants dated November 3, 2021*, 21 MAG 10547
>         Miscellaneous Case No. 21-mc-00825

Dear Judge Torres:

     This law firm represents Spencer Meads, a journalist who was previously employed by the non-profit news organization Project Veritas. Mr. Meads was the subject of search warrants for electronic devices that were executed by the FBI on November 4, 2021 in connection with the Government's criminal investigation relating to contents of a diary that was published by another news outlet over a year ago, and which purportedly belonged to Ashley Biden, daughter of then-candidate Joseph R. Biden. Through this motion, Mr. Meads hereby requests that the Court appoint a special master to (a) filter materials contained on electronic devices seized by the Government from Mr. Meads pursuant to the search warrants; and (b) oversee the Government's extraction and review of materials from the seized electronic devices.

## I.   INTRODUCTION

     The First Amendment and federal law demand that journalists be enabled to freely engage in legitimate newsgathering activities, including journalistic investigations involving confidential sources. Fundamentally, journalistic activities must be free from intrusion by the Government and law enforcement. Only through these means can the press perform its critical function as a check against activities by the Government, private individuals, and corporations. For these reasons, legitimate journalistic and newsgathering activities are generally shielded from search warrants, subpoenas, and other intrusions.

     In this instance, the Government wholly disregarded these fundamental principles, along with its obligations under federal law, by executing criminal search warrants against Mr. Meads and by seizing electronic devices containing information relating to journalistic investigations and confidential source materials. The Government made zero attempts to obtain the seized information

**The Dickerson Law Group**

November 18, 2021
Page 2 of 12

by less intrusive means, as required by law. Instead, federal agents broke through the door of a journalist in early morning hours, handcuffed him, and searched his belongings.

Even worse, the Government made zero efforts to limit seizure of electronically-stored information to devices that possibly could contain information relevant to the Government's diary investigation. Under any stretch of the imagination, the period relevant to the diary investigation does not pre-date August 2020. Yet, during their raid of Mr. Mead's residence, federal agents seized devices from Mr. Meads that were last utilized by Mr. Meads several years ago. In some instances, the devices have not been used by Mr. Meads since 2012 and 2013. Notably, federal agents seized old electronic devices that clearly were not in use during the last fifteen (15) months, including a Blackberry and an old-style flip phone. These devices, of course, are instantly recognizable as technologically ancient. The Government should not be permitted to extract or review any data from these devices.

That aside, the entire premise of utilizing a search warrant against a journalist to obtain newsgathering materials in connection with investigating the potential theft of property is grossly flawed. The extraordinary measure of utilizing search warrants against members of the press is reserved only for the most necessary circumstances involving matters of grave importance. Yet, the Government's diary investigation very clearly implicates no national security interests or matters involving imminent risk of death or serious bodily harm. One could argue that utilizing federal law enforcement resources to investigate whether the personal diary of a then-presidential candidate's daughter was stolen – a task that almost certainly be given low priority treatment by a local police detective if the diary's owner was an average American – should be beneath the Department of Justice's purview.

All of the foregoing concerns are significantly amplified by apparent leaks by the Government to news media organizations of information contained on devices seized during the FBI's raid against James O'Keefe, a journalist and Project Veritas's founder. According to court papers filed by Project Veritas and Mr. O'Keefe, information published in recent news reports could not have been known to the media absent Government leaks, including apparent unauthorized disclosure to the media of Project Veritas's attorney-client privileged materials. These apparent leaks demonstrate the risk of leaving the Government unsupervised to extract data and review information from devices seized in these raids. Accordingly, Mr. Meads hereby moves this Court to appoint a special master to (a) filter materials contained on electronic devices seized by the Government from Mr. Meads pursuant to the search warrants; and (b) oversee the Government's extraction and review of materials from the seized electronic devices.[1]

---

[1] By letter dated November 12, 2021, the undersigned advised the Court that Mr. Meads joins in the Motion to Appoint a Special Master filed by Project Veritas and Mr. O'Keefe. The undersigned also advised that the Government agreed to pause further extraction and review of ESI from devices belonging to Mr. Meads, pending this Court's resolution of the Motion to Appoint a Special Master filed by Project Veritas and Mr. O'Keefe. Nevertheless, the instant Motion is necessary

November 18, 2021
Page 3 of 12

## II. BACKGROUND

### A. *The Government's Diary Investigation*

Mr. Meads was previously employed as a journalist at Project Veritas from October 2011 to June 2012. He rejoined the news organization in September 2016 as a journalist until his departure in September 2021. Although Mr. Meads is no longer affiliated with Project Veritas, he occasionally engages in journalistic work that involves newsgathering activities.

As explained below, the underlying subject matter of the instant Motion is the Government's investigation of Ashley Biden's diary, which notably was never published by Project Veritas. Critically, all events relating to the Government's diary investigation began no earlier than August 2020. Accordingly, none of the work that Mr. Meads performed on behalf of Project Veritas before August 2020 – including newsgathering information and other information stored on his electronic devices before August 2020 – could have any possible relevance to or bearing whatsoever on the Government's diary investigation.

In October 2020, a news website known as National File (which is wholly unrelated to Project Veritas) began publishing excerpts of Ms. Biden's alleged diary and articles regarding the diary's contents. *See*, *e.g.*, Tom Pappert, *DIARY: Biden's Daughter Ashley Resents Him for His Money, Control, Emotional Manipulation – Whistleblower*, NAT'L FILE, October 25, 2020, available at https://nationalfile.com/diary-bidens-daughter-ashley-resents-him-for-his-money-control-emotional-manipulation-whistleblower/.

National File claimed to have obtained Ms. Biden's alleged diary from a "whistleblower" at another news organization that had chosen not to publish either the diary or reports regarding the diary. *Id*. To be sure, Project Veritas and Mr. Meads (a) had absolutely no involvement in National File's publication of the diary; (b) did not provide the diary to National File; and (c) did not have any advance knowledge of National File's intent to publish the diary.

As set forth in the pending Motion to Appoint a Special Master filed by Project Veritas and James O'Keefe (the "PV Motion"), Project Veritas first became aware of the diary's existence in August 2020 when Source 1 and Source 2 contacted Project Veritas through a proxy. PV Motion at p. 3. Just as Project Veritas and Mr. O'Keefe had never heard of Source 1 or Source 2 before this communication, Mr. Meads also had never heard of them. Nevertheless, Source 1 and Source 2 represented to Project Veritas that they were in possession of Ms. Biden's diary, which they claimed Ms. Biden had left abandoned at a house located in Delray Beach, Florida. *Id*. Mr. Meads and Project Veritas had absolutely no involvement with how Source 1 and Source 2 acquired possession of the

---

in order to ensure that appropriate protections are put into place should this Court allow the Government to continue extracting and reviewing the ESI.

**The Dickerson Law Group**

November 18, 2021
Page 4 of 12

diary.  In fact, all knowledge regarding the diary's acquisition by Source 1 and Source 2 came solely from Source 1 and Source 2.  *Id*.

Through their legal counsel, Source 1 and Source 2 requested payment from Project Veritas for contributing the diary for potential publication.  *Id*.  In negotiations between legal counsel for Source 1 and Source 2, on the one hand, and Project Veritas, on the other hand, Source 1 and Source 2 reaffirmed that they came into possession of the diary through lawful means.  *Id*.  Ultimately, Source 1 and Source 2 delivered the diary, along with other materials allegedly abandoned by Ms. Biden, to Project Veritas.  *Id*.

After conducting significant due diligence to determine whether the diary was authentic and deliberating internally whether to run a news story regarding the diary, Project Veritas opted against either publishing the diary or running a new story regarding it.  *Id*.  After making this decision, Project Veritas's General Counsel attempted to return the diary to Ms. Biden and her attorney; however, Ms. Biden's attorney declined to confirm whether or not the diary belonged to Ms. Biden.  *Id*. at p. 4.  In November 2020, Project Veritas arranged for delivery of the diary, along with other materials provided by Source 1 and Source 2, to Florida law enforcement authorities.  *Id*.

**B.     *The Search Warrants***

One year after Project Veritas provided the diary to Florida law enforcement authorities (and more than a year after a news organization unrelated to Project Veritas ran new stories relating to Ms. Biden's diary), the FBI executed search warrants against the residences of Mr. Meads, who previously was a journalist for Project Veritas, along with another journalist who was previously employed by Project Veritas.  In the early morning hours of November 4, 2021, the FBI executed two (2) search warrants against Mr. Meads (one warrant pertaining to his apartment residence and the other pertaining to electronic devices located on his person) (the "Search Warrants"), seizing multiple cellular phones, laptop computers, and other electronic devices.  Copies of the Search Warrants are attached as Composite Exhibit "A".  Two days later, the FBI executed a search warrant at the home of James O'Keefe, the founder of Project Veritas.

On November 4, 2021 at approximately 6:00 a.m., Mr. Meads was awoken by his apartment roommate, who advised Mr. Meads that several individuals claiming to be FBI agents were outside their front door.  Mr. Meads approached the front door and looked through the peephole to verify the that the individuals on the other side of the door were, in fact, law enforcement agents; however, he could not do so because the peephole was completely obstructed.  Justifiably alarmed and unable to verify that the individuals on the other side of the door were bona fide law enforcement agents, Mr. Meads took a few steps back while FBI agents forcibly broke through the door.

At that point, about a dozen FBI agents entered the apartment.  Both Mr. Meads and his roommate were immediately placed in handcuffs.  After about 15 minutes, the FBI removed the

November 18, 2021
Page 5 of 12

handcuffs. The agents required that Mr. Meads remain seated on his roommate's bed while the FBI searched his apartment for approximately three (3) hours.

During the search, Mr. Meads asked the FBI agents if he could place a telephone call to his attorney. The agents agreed to allow him to place the call; however, they advised Mr. Meads that the phone call would need to be placed using a phone that was not his iPhone. Mr. Meads advised the agents that he did not know his attorney's phone number and would need to look through his iPhone to obtain the number. The agents allowed Mr. Meads to look through his iPhone for this purpose and then promptly seized the unlocked iPhone.

C.   *The Seized Electronic Devices*

Importantly, none of the events that are relevant to the Government's diary investigation occurred before August 2020. Nevertheless, the FBI seized all of the following electronic devices from Mr. Meads:

- Mr. Meads' iPhone that is currently utilized by Mr. Meads on a day-to-day basis. This device contains journalistic and newsgathering information, including information pertaining to at least one confidential source.

- Nine (9) other iPhones, which were variously utilized by Mr. Meads from approximately 2014 through 2021. These devices were utilized over the years for journalistic and newsgathering purposes relating to Project Veritas.

- A smartphone (non-iPhone) that was last utilized by Mr. Meads in approximately 2018 in connection with Project Veritas-related work.

- A flip phone that was last utilized by Mr. Meads in approximately 2012.

- A BlackBerry device that has not been utilized by Mr. Meads since approximately 2012.

- An older model Asus laptop that was last utilized by Mr. Meads in approximately 2013. This laptop contains information relating to Mr. Meads' historical work for Project Veritas.

- A Lenovo laptop that was primarily utilized in 2018 in connection with Project Veritas-related work. This device was not utilized again by Mr. Meads, except for limited personal use in approximately August 2020.

**The Dickerson Law Group**

November 18, 2021
Page 6 of 12

- A broken MacBook laptop belonging to Mr. Meads' roommate, not Mr. Meads.

- Two (2) electronic storage devices (one SAN disk and one FOB with micro SD).

To the best of Mr. Meads' knowledge, none of the aforementioned seized devices contain any information whatsoever relating to Ashley Biden or the Government's diary investigation.[2] Notably, several of the phones that were seized by the Government were stored in a clear, plastic container under Mr. Meads' bed. Additionally, at least a couple of the seized phones were located in the top drawer of his bedroom dresser. The Lenovo and Asus laptop computers were located underneath Mr. Meads' bed when the FBI seized them. Consequently, besides the obvious fact that much of the technology was long outdated and would not have been used in years, it otherwise should have been apparent to federal agents that these devices had not been used in years and were not likely to contain any data pertinent to the Government's diary investigation.

### III.   Memorandum of Law

**A.   *The Government Should Not Have Obtained Search Warrants for Meads' Electronic Devices or Seized Devices Having No Relevance to the Government's Diary Investigation***

Clearly, the Government should not have (a) obtained the Search Warrants to obtain Mr. Meads' electronic devices; or (b) seized devices that clearly have zero relevance to the Government's diary investigation. With respect to the latter issue, the Court should not permit the Government to engage in extraction and review activities with respect to the devices that obviously contain no data or information whatsoever pertaining to the Government's diary investigation. These devices include (1) the Lenovo laptop that was last used by Mr. Meads in 2018, except for limited personal use in approximately August 2020; (2) the Asus laptop that was last used by Mr. Meads in approximately 2013; (3) the flip phone that was last used by Mr. Meads in 2012; (4) the smartphone (non-iPhone) that was last used by Mr. Meads in approximately 2018; (5) the Blackberry last used by Mr. Meads in approximately 2012; (6) the broken MacBook laptop belonging to Mr. Meads' roommate; and (7) various iPhones that were no longer in service as of August 2020. To the extent that the Court may permit extraction and review of data with respect to any of the aforementioned devices, it should be performed under the supervision and control of a special master.

---

[2] Unlike the devices seized in the FBI's separate raid against Mr. O'Keefe, it is not believed that any of the devices seized from Mr. Meads contain any attorney-client privileged communications. To the extent that any of the seized devices may contain attorney-client privileged materials, the arguments and case law cited in the PV Motion are expressly adopted as if fully set forth herein.

**The Dickerson Law Group**

November 18, 2021
Page 7 of 12

     *i.*    *The Government Violated 28 C.F.R. § 50.10 and Section 9-13.400 of the Justice Manual*

With respect to the former issue (i.e., the Government improperly obtaining the Search Warrants), the Search Warrants clearly should not have been issued. First, the Government's execution of the Search Warrants violated 28 C.F.R. § 50.10, which is reiterated and reinforced by Section 9-13.400 of the Justice Manual, governing the DOJ's use of process, orders, or warrants to obtain information from members of the news media. 28 C.F.R. § 50.10(a)(3) states, in relevant part: "The Department views the use of certain law enforcement tools, including . . . search warrants to seek information from, or records of, non-consenting members of the news media as extraordinary measures, not standard investigatory practices."

The Act further states:

> In determining whether to seek information from, or records of, members of the news media, the approach in every instance must be to strike the proper balance among several vital interests: Protecting national security, ensuring public safety, promoting effective law enforcement and the fair administration of justice, and safeguarding the essential role of the free press in fostering government accountability and an open society.

28 C.F.R. § 50.10(a)(2).

"[M]embers of the Department must obtain the authorization of the Attorney General to apply for a warrant to search the premises, property, communications records, or business records of a member of the news media" except when the Department is proceeding under the PPA's suspect exception. 28 C.F.R. § 50.10(d)(1). Accordingly, in order for the application for the Search Warrants to be properly made, the Attorney General of the United States would have been required to authorize the Search Warrants for seizure of journalistic, confidential source, and newsgathering materials regarding a diary that was (a) already in the public domain; and (b) was never published either by Project Veritas or Mr. Meads. It should be obvious that the extraordinary measure of seeking applications for the Search Warrants went far beyond what was either necessary or appropriate under the circumstances.

Importantly, in determining whether to authorize an application for a search warrant against a member of the news media, the 28 C.F.R. § 50.10(c)(5)(iv)(A) states:

> The government should have pursued negotiations with the affected member of the news media unless the Attorney General determines that, for compelling reasons, such negotiations would pose a clear and substantial threat to the integrity of the investigation, risk grave harm to

> national security, or present an imminent risk of death or serious bodily harm.

The Government completely failed to comply with the foregoing federal law before either obtaining or executing the Search Warrants. To be sure, the Government initiated absolutely no negotiations with Mr. Meads at any point in time regarding the devices sought by the Government. The morning of November 4, 2021 – i.e., when FBI agents charged through Mr. Meads' front door – was the first time that Mr. Meads was notified by the Government that his electronic devices were being requested. Thus, there was absolutely no good faith effort by the Government to comply with 28 C.F.R. § 50.10(c)(5)(iv)(A).

Separately, in order to be excused from the strict requirement of negotiating with Mr. Meads in good faith to secure electronic devices that the Government deemed necessary to its diary investigation, there must have been compelling circumstances that (a) such negotiations would pose a clear and substantial threat to the integrity of the Government's diary investigation; (b) there was a risk of grave harm to national security; or (c) such negotiations would have presented an imminent risk of death or serious body harm. It is beyond repute that none of these concerns were triggered by the nature of the Government's diary investigation. Consequently, it is clear that the Government violated 28 C.F.R. § 50.10 and Section 9-13.400 of the Justice Manual by obtaining and executing the Search Warrants.

### ii. *The Government Violated the Privacy Protection Act*

The Privacy Protection Act (the "PPA"), which is codified at 42 U.S.C. § 2000aa, further prohibited the Government from obtaining and executing the Search Warrants. The PPA generally prohibits search and seizure of "work product materials" that are possession by a person or entity in connection with "a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication." 42 U.S.C. § 2000aa(a). Similarly, the PPA prohibits search and seizure of non-work product materials that are "possessed by a person in connection with a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication, in or affecting interstate commerce." 42 U.S.C. § 2000aa(b).

Although the PPA contains a so-called "suspect exception", this exception specifically provides that "a government officer or employee may not search for or seize such materials under the provisions of this paragraph if the offense to which the materials relate consists of the receipt, possession, communication, or withholding of such materials or the information contained therein." 42 U.S.C. § 2000aa(a)(1), (b)(1). Accordingly, the suspect exception does not apply here. To the contrary, the PPA specifically prohibited the Government from obtaining the Search Warrants or seizing Mr. Meads' electronic devices.

November 18, 2021
Page 9 of 12

### B. The Government's Seizures Violated Mr. Meads' First Amendment Rights Relating to Freedom of the Press and Freedom of Association

Under well-developed case law, the Government's seizures of Mr. Meads' electronic devices clearly violated Mr. Meads' First Amendment rights relating to freedom of the press and freedom of association. In *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936), the Supreme Court recognized that a free press serves as a "one of the greatest interpreters between the government and the people." For this reason, the Supreme Court has extended First Amendment protections to persons and entities publishing truthful information obtained from a source regarding matters of public concern even where the source obtained the information unlawfully; provided, however, that the publisher is not involved in the unlawful activity. *See Bartnicki v. Vopper*, 532 U.S. 514, 534-35 (2001). This holding is consistent with the principle that "state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 102 (1979). Here, electronic devices belonging to Mr. Meads that he utilized in connection with legitimate newsgathering activities – and which contain specific information relating to confidential sources – should be protected against seizure under *Bartnicki*.

Other cases are in accord. *See, e.g., Allen v. Beirich*, No. 19-2419, 2021 WL 2911736 at *4-5 (4th Cir. Jan. 26, 2021) (holding that the Southern Poverty Law Center's payment for receipt of newsworthy information did not give rise to liability where it paid to acquire the information from a third party and the payment did not cause or induce the third party to engage in the unlawful acts necessary to procure the information); *Jean v. Massachusetts State Police*, 492 F. 3d 24, 31 (1st Cir. 2007) (holding that even though publisher actively collaborated with thieves, the publisher still maintained First Amendment protections under *Bartnicki*); *Democratic Nat'l Committee v. Russian Federation*, 392 F. Supp. 3d 410, (S.D. N.Y. 2019) (holding that where solicited already stolen documents from the Russian Federation, doing so was protected First Amendment activity and observing that "[j]ournalists are allowed to request documents that have been stolen and to publish those documents").

It is critical that the Court appropriately protect the confidential source information and newsgathering activities that are contained in Mr. Meads' seized devices. As correctly argued in the PV Motion, whistleblowers and confidential sources certainly will be reluctant to come forward to journalists if they realize that their identities eventually may be obtained by the Government through search warrants directed against journalists. *See, e.g., Dillon v. Suffolk County Dept. of Health Services*, 917 F. Supp. 2d 196, 212-13 (E.D. N.Y. 2013) (observing that whistleblower doctor who spoke out regarding jail medical program constituted protected speech about a matter of public concern under the First Amendment). Appointing a special master to direct and oversee extraction and review of data contained on the seized devices will help ensure that confidential source information is protected and not subjected to leaks by Government officials.

Moreover, to the extent that any of the seized devices may contain donor information relating to Project Veritas, the First Amendment's guarantee of freedom of association also is implicated. To

**The Dickerson Law Group**

November 18, 2021
Page 10 of 12

be sure, piercing the right of anonymous, private association would have a chilling effect to the constitutional right of association. *See Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (stating that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association" and "the vital relationship between freedom to associate and privacy in one's associations") (internal quotations omitted). To be sure, allowing the Government to access donor identities and information that may be contained on Mr. Meads' seized devices may effectively reduce or eliminate donor support to Project Veritas.

C.   *The Government's Utilization of a Filter Team is Inadequate*

While the Government's use of a taint team may be appropriate under certain circumstances, the instant situation is not one of those instances. Here, the appointment of a special master would be more appropriate in view of the significant First Amendment concerns that are implicated by the Government's seizure of multiple devices belonging to Mr. Meads containing and reflecting newsgathering activities over a multi-year period. These concerns are exacerbated by the Government's apparent leaks to news media organizations regarding the Government's diary investigation as it pertains to Project Veritas and its journalists. *See* November 10, 2021 and November 15, 2021 from Paul A. Calli, Esq. to the Court. Given that the Search Warrants were obtained by the Government in violation of the governing law regarding obtaining newsgathering materials from members of news organizations, frankly there is no way that the Government can be trusted to appropriately protect sensitive newsgathering and confidential source material residing on the seized devices.

Courts recognize that appointment of special masters is appropriate where sensitive issues regarding First Amendment protections are present. *See, e.g.*, *In re Storag Etzel GmbH*, No. 19-MC-209-CFC, 2020 WL 2915781 at *1 (D. Del. June 3, 2020) (involving appointment of special master having particular expertise regarding First Amendment matters); *DeMassa v. Nunez*, 747 F. 2d 1283, 1285 (9th Cir. 1984) (involving appointment of special master to determine whether items were privileged); *U.S. v. Duke Energy Corp.*, No. 1:00CV1262, 2012 WL 1565228 at *2-3 (M.D. N.C. Apr. 30, 2012) (involving appointment of special master to determine whether items were privileged or otherwise protected under the First Amendment). Here, it is clear that appointing a special master will protect the First Amendment concerns regarding confidential source and newsgathering data contained on the seized devices. *See, e.g.*, *In re application of Madison*, 687 F. Supp. 2d 103, 118-19 (E.D. N.Y. 2009) (requiring that petitioners make a showing of existence of First Amendment or privilege protection issues to justify appointment of a special master).

### IV.  Conclusion

Based on the foregoing, Mr. Meads respectfully requests that the Court order the following relief:

    A.  Grant this Motion in all respects;

    B.  Preclude the Government from extracting and reviewing any data from the seized devices belonging to Mr. Meads in their entirety, based upon the Government's violations of the governing law regarding obtaining search warrants directed to members of news organizations;

    C.  To the extent that the Court may be inclined to allow extraction and review of data from any of Mr. Meads' seized devices, specifically preclude the Government from extracting and reviewing data from Mr. Meads' seized devices that clearly were not utilized by Mr. Meads from August 2020 through the present;

    D.  To the extent that the Court may be inclined to allow extraction and review of data from any of Mr. Meads' seized devices, appoint a special master to oversee, direct, and supervise extraction and review from any and all devices that the Court determines may be subject to seizure; and

    E.  Order such other and further relief this Court deems just and proper.

Respectfully submitted,

By:_____
Brian E. Dickerson
New York State Bar No. 5169958
**THE DICKERSON LAW GROUP, P.A.**
6846 Trail Boulevard
Naples, FL 34108
Tel: (202) 570-0248
Fax: (239) 236-1260
*bdickerson@dickerson-law.com*

*Application for Attorney Admission to the Southern District of New York to be filed promptly*

**The Dickerson Law Group**

November 18, 2021
Page 12 of 12

/s Eric Franz
Eric Franz
New York State Bar No. 2601763
**THE LAW OFFICES OF ERIC FRANZ, PLLC**
220 Old Country Road
Mineola, NY 11501
Tel: (212) 355-2200
Fax: (212) 937-2217
eric@efranzlaw.com

CERTIFICATE OF SERVICE

I, Eric Franz, Esq., counsel for Petitioner, Spencer Meads, hereby certify that on November 18, 2021 the foregoing was filed with the Clerk of Court via the CM/ECF system, which has caused a true and correct copy to be served on all counsel of record.

/s Eric Franz
Eric Franz

Enclosures

cc: Via Email
Paul A. Calli, Esq.
Chas Short, Esq.
Harlan Protass, Esq.
Stephen R. Klein, Esq.
Benjamin T. Barr, Esq.
Robert Sobelman, Esq.
Mitzi Steiner, Esq.
Jacqueline Kelly, Esq.