# The Dickerson Law Group

**Brian E. Dickerson**
Partner
6846 Trail Blvd
Naples, FL 34108
Direct: 202.570.0248

Bdickerson@dickerson-law.com

November 24, 2021

**VIA EMAIL**
*Original will <u>not</u> follow by mail.*

The Honorable Analisa Torres
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    <u>*In re Search Warrants dated November 3, 2021*</u>, 21 MAG 10547
              <u>Miscellaneous Case No. 21-mc-00825</u>

Dear Judge Torres:

      This law firm, along with the Law Offices of Eric Franz, PLLC, represent Spencer Meads ("Meads") in the above-referenced action. The undersigned hereby submits this letter as a Reply in Support of Meads' pending Motion to Appoint Special Master [Dkt. 8].

## I.    INTRODUCTION

      The Government's misguided argument that Project Veritas is not a legitimate news organization has now been specifically rejected by yet another court. Yesterday, in the case styled *Project Veritas v. New York Times Co.*, Case No. 63921, pending in the Supreme Court of New York for Westchester County, Justice Charles Wood compared Project Veritas with The New York Times and noted that "both litigants are media organizations" to which First Amendment protections apply.[1] Accordingly, this Court should not indulge the Government's position that Project Veritas is not a news organization (*see* Opposition at pp. 9-10, n. 7) and, instead, should apply full First Amendment protection to Project Veritas and its journalists, including Meads.

      This Court should appoint a special master to review the contents of the electronic devices that the Government seized from journalist Meads in connection with the Government's investigation regarding Ashley Biden's diary. There are legitimate concerns regarding whether Government personnel have leaked information concerning its investigation, along with Project Veritas generally, to The New York Times and other news organizations. This particular issue remains unresolved although the Government has denied such leaks. *See* Opposition [Dkt. No. 29] at p. 20. Nonetheless,

---

    [1]    The relevant portion of the transcript reflecting Justice Charles Wood's statements at the November 23, 2021 hearing will be filed in the instant action when the transcript becomes available.

**The Dickerson Law Group**

November 18, 2021
Page 2 of 11

the Government's utilization of a filter team under these circumstances poses the distinct possibility that First Amendment-protected newsgathering materials contained on Meads' electronic devices that were seized by the Government (the "Seized Devices") – including newsgathering information contained on devices that were no longer utilized by Meads years before the events underlying the Government's diary investigation began – may surreptitiously find their way into the public domain, thereby inflicting irreparable harm to Meads' First Amendment rights.  Further, improper disclosure of newsgathering materials contained on the Seized Devices would cause harm to the public interest by having a chilling effect on the willingness of confidential sources to come forward in the future.

   The appointment of a special master will avoid the appearance of unfairness that is associated with having the Government's own personnel involved as filter team members and prosecution team members.  The public concern regarding the appearance of impropriety with having a filter team involved in extracting and reviewing devices containing First Amendment-protected materials is actual, not hypothetical.  As explained below, several members of Congress already have expressed their concerns to the Attorney General regarding their view that the treatment given by the Department of Justice to Project Veritas and its journalists is disproportionate under the circumstances and otherwise potentially influenced by political motivations.

   Moreover, the Government has not indicated that it will suffer any prejudice whatsoever by this Court's appointment of a special master.  To the contrary, the Government takes the position that filter teams have been utilized by the U.S. Attorney's Office for the Southern District of New York more than 300 times over the past three (3) years.  Opposition at p. 14.  The Government offers no rationale for utilizing a filter team in this particular instance, other than implying that this case should be treated no differently than the other 300 cases.  Yet, the Government's Opposition does nothing to alleviate or meaningfully address the legitimate concerns surrounding these proceedings by way of the Government's apparent leaks to news organizations and the appearance of unfairness that has gone noticed by several legislators, along with the public generally.

   Appointment of a special master would therefore provide safeguards against leaks as well as alleviate the appearance of impropriety, which would accompany the Government's taint team performing the review under these unusual circumstances.  Notably, the Government's Opposition asserts that its investigation is limited to a narrow course of conduct and particular offenses listed in the search warrants and, accordingly, the scope of the Government's investigation does not include all of the activities relating to Project Veritas, O'Keefe, Meads, and Cochran.  *See* Opposition at p. 15.  In view of the Government's concession that its investigation is narrow in scope, a designated non-governmental third party – such as a special master – should be able to efficiently (a) review the Seized Devices to determine whether the devices were used on or after August 2020; (b) exclude devices that were not utilized on or after August 2020 from potential review by the Government; and (c) handle review of any devices that were utilized by Meads post-August 2020 to ensure that First Amendment-protected data is not released to the Government, such that the only information that would ever come into the Government's possession is post-August 2020 data that does not contain First Amendment-protected information.

## II. MEMORANDUM OF LAW

**A. First Amendment Protections Clearly Extend to Journalistic Materials, Confidential Source Materials, and Newsgathering Activities Residing on the Seized Devices**

As explained above, the Government's position that Project Veritas is not a news organization was rejected on November 23, 2021 by Justice Charles Wood in the case styled *Project Veritas v. New York Times Co.*, Case No. 63921, pending in the Supreme Court of New York for Westchester County. At the hearing, Justice Wood compared Project Veritas with The New York Times and specifically observed that "both litigants are media organizations" to which First Amendment protections apply. Accordingly, full First Amendment protection should be extended to Project Veritas and its journalists, including Meads.

The First Amendment protects journalistic materials, confidential source materials, and newsgathering activities residing on the Seized Devices. While the Government attempts to draw a distinction between passive and active involvement in allegedly unlawful activities relating to obtaining Ms. Biden's diary (*see* Opposition at pp. 3-4), this distinction makes no difference from a legal standpoint. Simply put, it makes no difference whatsoever whether the nature of Meads' involvement was passive or active. In *Jean v. Massachusetts State Police*, 492 F. 3d 24 (1st Cir. 2007), the plaintiff was a political activist who obtained and posted on her website a copy of a video recording that was made in violation of the Massachusetts electronic interception statute. *Id*. at 25-26. When the police threatened to charge the plaintiff with a felony unless she abided by its cease and desist demand, the plaintiff obtained injunctive relief in federal district court. *Id*. at 26. The Government argued that the plaintiff "assisted, conspired, or served as an accessory to [the recorder's] violation . . . ." and, further, that the plaintiff's "active collaboration with [the recorder] . . . made his unlawful dissemination possible in the first instance." *Id*. at 31. Relying on *Bartnicki v. Vopper*, 532 U.S. 514 (2001), the First Circuit upheld the injunction and rejected the Government's argument that the plaintiff had any liability for the underlying criminal activity. The First Circuit stated:

> The police still insist on a distinction between [the plaintiff] and the defendants in *Bartnicki* because [the plaintiff's] "active collaboration" with [the recorder] as the essential "first link" in the chain of dissemination distinguishes this case from *Bartnicki*. They contend that [the plaintiff] "had the opportunity to prevent the dissemination" and that "no one farther down the chain would have the same opportunity." We also find this distinction unpersuasive. Critically, in *Bartnicki,* Yocum had the opportunity to prevent further disclosure. Although he did not know the tape was illegally intercepted when he received it, he had that knowledge at the time he disclosed the tape to the school board and Vopper. Thus, both Yocum and Jean could have prevented further dissemination by refusing to disclose the tape. ***In light of this similarity, the fact that Yocum received the tape***

**The Dickerson Law Group**

November 18, 2021
Page 4 of 11

> *"passively" and Jean received the tape "actively" is a distinction without a difference: both made the decision to proceed with their disclosures knowing that the tape was illegally intercepted, yet the Supreme Court held in Bartnicki that such a knowing disclosure is protected by the First Amendment.*

*Id*. at 32 (emphasis added).

Notably, the Government's Opposition relies on *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410 (S.D.N.Y. 2019) and *Cochrum v. Donald J. Trump for President, Inc.*, 365 F. Supp. 3d 652 (E.D. Va. 2019). *See* Opposition at pp. 1, 6-7. Those cases, however, have nothing to do with seizing materials from newsgathering organizations. Accordingly, the Government's reliance on *Democratic Nat'l Comm.* and *Cochrum* is misplaced. Moreover, *Democratic Nat'l Comm.* actually serves to debunk the Government's argument in the instant action that a journalist's purported active involvement in procuring stolen materials somehow eviscerates First Amendment protection. In *Democratic Nat'l Comm.*, the Democratic National Committee (the "DNC") contended that WikiLeaks, along with Julian Assange, its founder, were not entitled to First Amendment protection with respect to documents that had been solicited from an alleged thief, while having knowledge that the documents were stolen and coordinating with the alleged thief to disseminate the materials. *Democratic Nat'l Comm.*, 392 F. Supp. 3d at 433-34. Relying on *Bartnicki*, Judge Koeltl stated: "As an initial matter, it is constitutionally insignificant that WikiLeaks knew the Russian Federation had stolen the documents when it published them." *Id*. at 434. Additionally, "contrary to the DNC's argument, it is also irrelevant that WikiLeaks solicited the stolen documents from Russian agents." *Id*. at 435. In making this point, Judge Koeltl specifically observed that in *Jean* the First Circuit held that the First Amendment "protected an individual who posted a recording on the internet that was illegally recorded and who was in 'active collaboration' with the source in disclosing the unlawfully acquired information." *Id*. "Indeed, the DNC acknowledges that this is a common journalistic practice." *Id*. Further, the district court stated:

> The DNC's argument that WikiLeaks can be held liable for the theft as an after-the-fact coconspirator of the stolen documents is also unpersuasive. That argument would eviscerate *Bartnicki*; such a rule would render any journalist who publishes an article based on stolen information a coconspirator in the theft. Jean, 492 F.3d at 31; Nicholson v. McClatchy Newspapers, 177 Cal. App. 3d 509, 521, 223 Cal.Rptr. 58 (Ct. App. 1986) ("[C]onclusory allegation[s] of a conspiracy cannot serve to transform privileged behavior of the media defendants into tortious misbehavior.").

*Id*.

Additionally, the Government's incorrect argument that "active involvement" by a journalist somehow eviscerates First Amendment protections for legitimate newsgathering materials does not accurately reflect the Supreme Court's determination in *Bartnicki*. In *Bartnicki,* the Supreme Court

**The Dickerson Law Group**

November 18, 2021
Page 5 of 11

held that the First Amendment protects news organizations from punishment where they publish information obtained lawfully from a third party. *Bartnicki*, 532 U.S. at 535. This holding does *not* support the Government's position that First Amendment protection is unavailable to journalists who have involvement in unlawful conduct that is the subject of a Government investigation. *See* Opposition at p. 7. Similarly, *Bartnicki* has no relevance to the issue of whether the Government may obtain and execute search warrants against journalists and news organizations. Instead, this particular issue is governed by 28 C.F.R. § 50.10, Section 9-13.400 of the Justice Manual, and the Privacy Protection Act, codified at 42 U.S.C. § 2000aa, all of which the Government violated. *See* Meads' pending Motion to Appoint Special Master [Dkt. No. 8] at pp. 7-8.

Although the Opposition misstates the law by arguing that active involvement, collaboration, or participation somehow diminishes First Amendment protections (which, as shown above, it does not), the Opposition fails to cite any case where the Department of Justice obtained search warrants to seize newsgathering materials from journalists or news media organizations. Notably, the undersigned also has been unable to locate such a case. Consequently, permitting information to be extracted and reviewed by the Government from the Seized Devices clearly would constitute an unprecedented intrusion into First Amendment-protected newsgathering materials. While the Government attempts to diminish the implications of its wrongful actions by alleging that Project Veritas and its journalists were not engaged in the Government's self-serving, unilateral definition of journalism (*see* Opposition at pp. 9-10, n. 7), the Government's position reeks of the same bias and political motivations that quite obviously prompted the Government's use of the Search Warrants against Meads to obtain First Amendment-protected newsgathering materials in the first place. This type of argument already has been rejected by Judge Koeltl. See *Democratic Nat'l Comm*, 392 F. Supp. 3d at 435 (rejecting the DNC's argument that freedom of the press was not threatened because "WikiLeaks did not engage in normal journalistic practices").

Here, the Government has not insinuated that Meads (or, Project Veritas, O'Keefe, and Cochran, for that matter) did anything other than coming into possession of Ms. Biden's diary, after the diary allegedly had been stolen by third parties. Under these circumstances, there is absolutely no justification for the Government's (a) use of the Search Warrants against Meads; or (b) its flawed position that the newsgathering materials contained within the Seized Devices are not afforded First Amendment protection. *See*, *e.g.*, *Democratic Nat'l Comm.*, 392 F. Supp. 3d at 435 (recognizing that meeting with thieves and soliciting stolen documents are among common journalistic practices).

Notably, the Government seeks to justify its search as appropriate based upon the "suspect exception" to the Privacy Protection Act (the "PPA"). The Government, however, misleads the Court by omitting the critical statutory language. The Opposition states:

> [T]he PPA has no bearing on the search warrants at issue here because the relevant provisions contain a "suspect exception", under which the PPA does not apply where law enforcement has "probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate."  42 U.S.C. § 2000aa(a)(1).

**The Dickerson Law Group**

November 18, 2021
Page 6 of 11

Dkt. No. 29 at p. 14, n. 10.

The Government, however, fails to disclose to the Court that the "suspect exception" does not apply where the suspect offense involves receipt, possession, communication, or withholding of materials to be used in disseminating a newspaper, book, broadcast, or similar form of public communication. Specifically, the statute states:

> *Provided*, *however*, that a government officer or employee **may not** search for or seize such materials under the provisions of this paragraph ***if the offense to which the materials relate consists of the receipt, possession, communication, or withholding of such materials*** or the information contained therein . . .

42 U.S.C. § 2000(a)(1) (italics original) (bold emphasis added).[2]

Accordingly, the search warrants that were executed by the Government against Meads were expressly forbidden by law, given that the offense to which the subject electronic devices relate consist only of receipt, possession, communication, or withholding of such materials. *See* 42 U.S.C. § 2000(a)(1).

**B.     The Government's Utilization of a Filter or Taint Team is Not Appropriate Under the Circumstances**

The Government's utilization of a filter or taint team is wholly inappropriate under the circumstances. The Government has represented that it fully complied with all regulations governing what it must do to obtain approval to execute a search warrant against members of the news media. *See* Opposition at p. 2, n. 2. These regulations, along with guidance in the Justice Manual, require approval from the most senior DOJ officials. *See* PV Motion [Dkt. No. 10] at pp. 8-9.[3] The Attorney General has stated: "The Department of Justice will no longer use compulsory legal process for the purpose of obtaining information from or records of members of the news media acting within the scope of newsgathering activities . . ." *See* Attorney General Memorandum for the Deputy Attorney General, The Associate Attorney General, Heads of Department Components, United States Attorneys, Federal Prosecutors, July 19, 2021, *available at*

---

[2]     This language itself has exceptions; however, none of them apply here. The exceptions related to national defense information, classified information, information relating to sexual exploitation of children (*id*.) or, if there is reason to believe that immediate seizure of such materials is necessary to prevent death of, or serious bodily injury, to a human being. 42 U.S.C. § 2000aa(a)(2).

[3]     References to the Motion to Appoint Special Master filed by Project Veritas and O'Keefe dated November 12, 2021 [Dkt. No. 10] filed in Case No. 21 Misc. 813 (AT) are denoted herein as "PV Motion at p. ___."

**The Dickerson Law Group**

November 18, 2021
Page 7 of 11

https://www.justice.gov/ag/page/file/1413001/download.  The Government's seizure of Meads' devices is incongruous with the Attorney General's Memorandum.

Indeed, just last week members of Congress expressed their concerns to the Attorney General regarding the apparent politicization of the DOJ's use of search warrants against Project Veritas, a conservative-leaning news organization.[4]  Separately, on November 17, 2021, Senator Chuck Grassley, Ranking Member of the Senate Judiciary Committee, expressed significant concerns to the Attorney General regarding the FBI's utilization of search warrants against Project Veritas and its journalists.[5]  The appearance of fairness is indisputably a matter of public concern.

Moreover, as stated in the PV Motion, the Government's diary investigation – including the portions of the Government's investigation specifically involving use of search warrants against Project Veritas journalists – has been dogged by obvious Government leaks to news media organizations, including The New York Times.  *See* PV Motion at pp. 4-7.  As specifically noted in the PV Motion, the Government's apparent leaks to The New York Times are amplified by the fact that Project Veritas currently has pending civil litigation against this news organization.  *See* PV Motion at pp. 6-7 (referencing *Project Veritas v. New York Times Co.*, No. 63921, 2021 WL 2395290 at *1 (N.Y. Sup. Mar. 18, 2021)).  The Government's leaks to The New York Times were further addressed by Project Veritas and O'Keefe in their pending Motion to Identify Source of Government Leaks dated November 15, 2021.  *See* Case No. 21 Misc. 813 (AT), Dkt. No. 13.

Concerns regarding (a) informational leaks by filter teams, and (b) the appearance of unfairness associated with filter teams are exactly why federal courts oftentimes disfavor the Government's use of filter teams.  In *United States v. Gallego*, No. CR-18-01537-001-TUC-RM (BPV), 2018 WL 4257967, at *2 (D. Ariz. Sept. 6, 2018), the district court stated:

> Although use of taint teams has been approved in limited factual scenarios, federal courts have generally "taken a skeptical view of the Government's use of 'taint teams' as an appropriate method for determining whether seized or subpoenaed records are protected by the attorney-client privilege." *United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1037 (D. Nev. 2006).  "[T]aint teams present

---

[4]  *See* Ex. "A", November 18, 2021 Letter from House Judiciary Committee Ranking Member Jim Jordan, House Oversight and Reform Committee Ranking Member James Comer, and Senate Permanent Subcommittee on Investigations Ranking Member Ron Johnson directed to Attorney General Merrick B. Garland (stating that "[t]he Department and the FBI must not be used for political purposes to target the Administration's political rivals").

[5]  *See* Ex. "B", November 17, 2021 Letter From Senate Judiciary Committee Ranking Member Chuck Grassley to Attorney General Merrick B. Garland (stating that "[t]he Department's heavy-handed treatment of Project Veritas is notably different from the kid-glove and deferential treatment given to Hillary Clinton and her staff during its investigation into her mishandling of highly classified information").

**The Dickerson Law Group**

November 18, 2021
Page 8 of 11

> inevitable, and reasonably foreseeable, risks to privilege." *In re Grand Jury Subpoenas 04-124-03 & 04-124-05*, 454 F.3d 511, 523 (6th Cir. 2006). The Government's taint team may "have a more restrictive view of privilege" than the defense. *Id*. **In addition, the Government's conflicting interests in both preserving privilege and pursuing the investigation present inherent risks.** See *id*. **Taint teams "have been implicated in the past in leaks of confidential information to prosecutors."** *Id*. **And even if no leaks occur, the use of walled-off taint teams undermines the appearance of fairness and justice.** See In re Search Warrant for Law Offices Executed on March 19, 1992, 153 F.R.D. 55, 59 (S.D.N.Y. 1994); [*U.S. v. Stewart*, No. 02-CR 396-JGK, 2002 WL 1300059 at *8 (S.D. N.Y. June 11, 2002).] "It is a great leap of faith to expect that members of the general public would believe" that a wall separating members of the taint team from members of the prosecution "would be impenetrable." *In re Search Warrant*, 153 F.R.D. at 59.

(emphasis added).

*In re Grand Jury Subpoenas*, 454 F. 3d 511 (6th Cir. 2006) specifically criticized the Government's use of taint teams. The Sixth Circuit stated:

> Furthermore, taint teams present inevitable, and reasonably foreseeable, risks to privilege, for they have been implicated in the past in leaks of confidential information to prosecutors. That is to say, the government taint team may have an interest in preserving privilege, but it also possesses a conflicting interest in pursuing the investigation, and, human nature being what it is, occasionally some taint-team attorneys will make mistakes or violate their ethical obligations. It is thus logical to suppose that taint teams pose a serious risk to holders of privilege, and this supposition is substantiated by past experience. In *United States v. Noriega*, 764 F. Supp. 1480 (S.D. Fla. 1991), for instance, the government's taint team missed a document obviously protected by attorney-client privilege, by turning over tapes of attorney-client conversations to members of the investigating team. **This Noriega incident points to an obvious flaw in the taint team procedure: the government's fox is left in charge of the appellants' henhouse, and may err by neglect or malice, as well as by honest differences of opinion.**

*Id*. at 523 (emphasis added).

Here, the precise concerns expressed in *Gallego* and *In re Grand Jury Subpoenas* are specifically at play. To date, the Government has offered no plausible explanation as to how The New York Times could have possibly obtained the information specifically addressed in the pending PV Motion. The only explanation offered is that the Government allegedly approached multiple individuals as part of its investigation prior to executing the search warrants and that neighbors of O'Keefe, Meads, and Cochran observed the execution of the search warrants. *See* Opposition at p. 20. Suffice to say, it is more likely that there is a leak within the Government's personnel than it is that neighbors alerted The New York Times that the FBI was present at the residences of O'Keefe, Meads, and Cochran. Separately, sitting members of Congress have publicly expressed concerns regarding apparent political bias involved in the DOJ's execution of search warrants against Project Veritas and its journalists. Clearly, the use of filter teams would afford zero protection against further misbehavior by the Government and, in fact, would exacerbate the concerns addressed by *Gallego* and other courts.

Additionally, the undersigned is aware of no authority for the proposition that a filter team may be utilized in the context of First Amendment-protected materials. Notably, the Government's Opposition cites no such authority. While filter teams are not utilized exclusively in the attorney-client privilege context (*see United States v. Sealed Search Warrant*, No. 2:17-CR-103-VEH-TMP-1, 2017 WL 3396441 at *1-2 (N.D. Ala. Aug. 8, 2017)), the attorney-client privilege certainly constitutes the most recognizable scenario involving the Government's use of filter teams. The serious concerns expressed by federal courts regarding use of filter teams in the context of the Government's review of attorney-client privileged materials are arguably even more serious where constitutional guarantees are implicated, including freedom of the press. Nevertheless, there is no indication that the Government's use of a filter team could possibly be appropriate in view of existing concerns relating to news media leaks and appearance of fairness concerns. Simply put, permitting the Government to utilize a filter team under these existing tenuous circumstances would only serve to make existing problems and criticisms worse, not better. *See In re Search Warrant for Law Offices Executed on March 19, 1992*, 153 F.R.D. 55, 59 (S.D. N.Y. 1994) (stating that "[t]he appearance of Justice must be served, as well as the interests of Justice").

**C.      Appointment of a Special Master is Particularly Appropriate Under the Instant Circumstances**

The Government's Opposition sets forth no facts demonstrating how the Government would be prejudiced by the appointment of a special master in any way, shape, or form. Instead, the Government argues that the U.S. Attorney's Office for the Southern District of New York has conducted filter reviews in more than 300 investigations and cases over the past three (3) years. Opposition at p. 14. In other words, when it comes to filter teams the Government argues that what is good enough for the goose is good enough for the gander.

The Government's position, however, does not reflect the appropriate standard by which courts determine whether filter teams can be sufficiently employed or whether appointment of a special master or some other mechanism should be utilized. Notably, courts have engaged special masters in cases involving First Amendment protections. *See, e.g., In re Storag Etzel GbmH*, No. 19-MC-209-

**The Dickerson Law Group**

November 18, 2021
Page 10 of 11

CFC, 2020 WL 2915781 at *1 (D. Del. June 3, 2020) (involving special master who ultimately concluded that sealing of filings in question was not justified under rights of access emanating from the First Amendment); *U.S. v. Duke Energy Corp.*, No 1:00CV1262, 2012 WL 1565228 at *2-3 (M.D. N.C. Apr. 30, 2012) (involving appointment of special master to determine issues relating to privileges, including First Amendment concerns). "[A] court always retains the prerogative to require a different method of review in any particular case, such as requiring the use of a special master or reviewing the seized documents *in camera* itself." *In re Search of Electronic Communications in the Account of chakafattah gmail.com at Internet Service Provider Google, Inc.*, 802 F. 3d 516, 530, n.53 (3rd Cir. 2015). Here, appointment of a special master will protect newsgathering materials contained on the Seized Devices that are the subject of First Amendment protections.

  A district court may refer aspects of a case to a special master "when a court is faced with a polycentric problem that cannot easily be resolved through a traditional courtroom-bound adjudicative process." *Hart v. Community School Bd. of Brooklyn, New York School Dist. No. 21*, 383 F. Supp 699, 766 (E.D. N.Y. 1974). As explained above, the type of problem currently facing the Court is polycentric by nature. There is a legitimate concern that someone (or some people) within the Government may be leaking information to The New York Times and/or other news organizations regarding the Government's diary investigation, along with other confidential information regarding Project Veritas. Additionally, the appearance of impropriety is particularly at issue here, given that members of Congress formally raised with the Attorney General their concerns regarding the propriety of using search warrants against a conservative-learning news organization and its journalists as a matter of public concern. *See* Exs. "A" and "B". In view of these persistent issues, the independence offered by appointing a special master would help to alleviate these concerns and restore public confidence in the Government's handling of matters relating to Project Veritas and its journalists.

  Accordingly, consistent with its supervisory authority to appoint a special master where there is no pending criminal case against the subjects of the search, this Court should appoint a special master to direct and supervise the Government's extraction and review of information from the Seized Devices. *See*, *e.g.*, *In re the Matter of Search Warrants Executed on April 9, 2018*, No. 18-MJ-3161 (S.D.N.Y. Apr. 27, 2018) (Dkt. No. 30) (appointing a special master pursuant to Fed. R. Civ. P. 53(a)(1)(C) and the court's "inherent equitable powers and authority").

### III.  CONCLUSION

  Based on the foregoing, Petitioner, Spencer Meads respectfully requests that (a) this Court grant the Motion to Appoint Special Master in all respects; (b) appoint a special master to review the contents of electronic devices belonging to Meads that were seized by the Government; and (c) enter such other and further relief this Court deems just and proper.

**The Dickerson Law Group**

November 18, 2021
Page 11 of 11

                                              Respectfully submitted,

By: _____
      Brian E. Dickerson
      New York State Bar No. 5169958
      **THE DICKERSON LAW GROUP, P.A.**
      6846 Trail Boulevard
      Naples, FL 34108
      Tel: (202) 570-0248
      Fax: (239) 236-1260
      *bdickerson@dickerson-law.com*

*Application for Attorney Admission to the Southern District of New York to be filed promptly*

/s Eric Franz
Eric Franz
**THE LAW OFFICES OF ERIC FRANZ, PLLC**
220 Old Country Road
Mineola, NY 11501
Tel: (212) 355-2200
Fax: (212) 937-2217
*eric@efranzlaw.com*

Enclosures

cc:    <u>Via Email and CM/ECF</u>
       Robert Sobelman, Esq.
       Mitzi Steiner, Esq.
       Jacqueline Kelly, Esq.
       Eric Franz, Esq.